IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-02749-PAB

AUDUBON SOCIETY OF GREATER DENVER,

      Petitioner,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

      Respondent,

CASTLE PINES METROPOLITAN DISTRICT,
CASTLE PINES NORTH METROPOLITAN DISTRICT,
CENTENNIAL WATER AND SANITATION DISTRICT,
CENTER OF COLORADO WATER CONSERVANCY DISTRICT,
CENTRAL COLORADO WATER CONSERVANCY DISTRICT,
TOWN OF CASTLE ROCK, and
COLORADO DEPARTMENT OF NATURAL RESOURCES,

      Intervenor Respondents.

---

# ORDER

---

This matter is before the Court on petitioner's Petition for Review of Agency Action [Docket No. 1] and Petitioner's Opening Brief for Review of Agency Action [Docket No. 49] challenging respondent's actions in approving the Chatfield Reallocation Project. Petitioner's claims arise under the federal Administrative Procedures Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Clean Water Act ("CWA"). The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## I. BACKGROUND

Petitioner Audubon Society of Greater Denver ("the Audubon Society")
challenges respondent United States Army Corps of Engineers' ("the Corps") plan to
reallocate 20,600 acre-feet of water in Chatfield Reservoir from flood control to storage
for municipal and industrial use.  Docket No. 1.

Chatfield Reservoir is a reservoir located in Chatfield State Park along the South
Platte River southwest of Denver, Colorado.  The reservoir was constructed as part of
the Chatfield Dam and Lake Project, which Congress authorized in 1950.  *See* Flood
Control Act of 1950, Pub. L. No. 81-516, 64 Stat. 163, 175; R. at 036125.  The Corps
began construction of the dam used to create the reservoir in 1967.  R. at 036141.  In
1974, the Corps leased the area to the State of Colorado to form Chatfield State Park.
R. at 036142.  The reservoir is surrounded by open space containing forests and rolling
plains that are home to a variety of plants and wildlife.  R. at 036154.  Chatfield State
Park has numerous recreation facilities including hiking trails, picnic areas, and boating
facilities.  *Id*.; R. at 036142.

In 1986, Congress legislated modifications to the reservoir that authorized the
Secretary of the Army ("the Secretary"), "in coordination with the Colorado Department
of Natural Resources [("CDNR")] and upon the Chief of Engineers' finding of feasibility
and economic justification, to reassign a portion of the storage space in the Chatfield
Lake."  Water Resources Development Act of 1986 ("WRDA"), Pub. L. No. 99-662,
§ 808, 100 Stat. 4082, 4168.2.  Under the WRDA, the storage space is to be
reassigned "to joint flood control-conservation purposes, including storage for municipal
and industrial water supply, agriculture, and recreation and fishery habitat protection

2

and enhancement." *Id*. Congress conditioned the reassignment on the non-federal participants' agreement to reimburse the Corps for the associated costs. *Id*. The non-federal participants are the water providers, who would supply the water to be stored in the added storage capacity and who include intervenor-respondents. *See* Docket No. 17; Docket No. 17-2 at 5-9; R. at 035125. In 2009, Congress authorized the CDNR to perform mitigation and modifications of the reservoir to reallocate reservoir capacity to storage space provided that the Secretary and the CDNR "determine costs to be repaid for storage that reflects the limited reliability of the resources and the capability of non-Federal interests to make use of the reallocated storage space in Chatfield Reservoir, Colorado." Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 116, 123 Stat. 524, 608.

The Corps and the Colorado Water Conservation Board ("CWCB") formed the Chatfield Reservoir storage reallocation study ("the study group") to research possibilities for the reallocation project. R. at 036127. Beginning in 2007, the Audubon Society participated in the study group as a special technical advisor. R. at 006932.

The study group developed objectives for the project in light of "the main problem being defined as increasing water demand in the Denver Metro area." R. at 036153. "The purpose and need" of the project was determined to be "to increase availability of water, providing an additional average year yield of up to approximately 8,539 acre-feet of municipal and industrial (M&I) water, sustainable over the 50-year period of analysis, in the greater Denver Metro area so that larger proportion of existing and future water needs can be met." *Id*. The "average year yield" was defined as the "the average amount of water per year that the water providers (not including Hock Hocking or Parker

WSD) would have been able to store in Chatfield during the 1942-2000 period of record (POR) if Chatfield Dam had existed during the entire POR." *Id*. The project was not intended to be a comprehensive solution, but a "component in the overall effort to meet the water supply needs of the greater Denver Metro area and . . . contribute to meeting portion of those needs." *Id*. Some constraints on the project were the need to avoid compromising the reservoir's original flood protection purpose, to maintain the park's recreation facilities, and to maintain the "diverse array of habitats that are important to many fish and wildlife species, including the federally-protected Preble's meadow jumping mouse." R. at 036154; *see also* R. at 036176-77 (identifying various constraints "unique to the project that alternative plans should avoid").

The study group performed an "initial screening" of an "initial set of concepts [that] was identified based on problems and opportunities . . . to increase the water supplies for the South Platte River Basin." R. at 036179. Applying criteria based on the purpose, need, and identified constraints, the study group narrowed a group of thirty-eight initial concepts to a set of four alternative plans ("the Alternatives") that would be evaluated in detail. R. at 036181. The four Alternatives were:

> 1. No Action—Penley Reservoir combined with Gravel Pit Storage. Under the No Action Alternative flood control storage space within Chatfield Reservoir would not be reallocated to joint flood control-conservation storage (hereafter referred to as conservation or water supply storage/pool), and the operation of the reservoir would remain the same. For this alternative it was assumed the water providers would use Penley Reservoir and gravel pit storage to meet their future water needs. The water providers would newly construct Penley Reservoir and would install the infrastructure needed to convert existing gravel pits for water storage.

> 2. Least Cost Alternative to Chatfield Reservoir storage

reallocation—NTGW[1] combined with Gravel Pit Storage. Normally the No Action Alternative is also the Least Cost Alternative. However, the water providers participating in the Chatfield Reservoir reallocation study are opposed to long-term use of NTGW due to water supply management strategies of becoming less dependent on non-renewable water supplies. For this study, it is assumed that NTGW could provide water to a significant part of upstream water providers through the 50-year planning period, and downstream water providers would be served by the development of gravel pits for water storage.

3. Reallocation to allow an additional 20,600 acre-feet of Water Supply Storage. The 20,600 Acre-Foot Reallocation Alternative would reallocate storage from the flood control pool to the conservation pool. The additional storage would be used for M&I water supply, agriculture, recreation, and fishery habitat protection and enhancement purposes. Under this alternative, the base elevation of the flood control pool would be raised from 5,432 to 5,444 feet msl[2] but the reallocation of storage for this proposal involves only the volume between 5,432 and 5,444 feet msl.

4. Reallocation to allow an additional 7,700 acre-feet of Water Supply Storage combined with NTGW and Gravel Pit Storage. The 7,700 Acre-Foot Reallocation Alternative, like Alternative 3, would reallocate storage from the flood control pool to the conservation pool for multiple purposes. Again the additional storage would be used for M&I water supply, agriculture, recreation and fishery habitat protection and enhancement purposes. Because the average year yield from Chatfield Reservoir storage reallocation for Alternative 4 is less than the average year yield for Alternative 3, additional water supply sources (NTGW and downstream gravel pit storage) are also included in Alternative 4 so that the total average year yield equals 8,539 acre feet, but the reallocation of storage for this proposal involves only the volume between 5,432 and 5,437 feet msl.

R. at 036132-036133.

In July 2013, the Corps issued its Final Integrated Feasibility

---

[1] The abbreviation "NTGW" refers to non-tributary ground water, R. at 036104, which is "groundwater that is essentially unconnected to surface streams and is an exhaustible resource." R. at 36166.

[2] The abbreviation "feet msl" refers to the elevation, i.e., feet above mean sea level. R. at 36104.

Report/Environmental Impact Statement ("FR/EIS") and invited public comment. R. at 036105. The Corps selected Alternative 3, reallocation of 20,600 acre-feet of reservoir capacity to storage, "because it is the alternative that minimizes the cost of supplying water," R. at 036557, and because it "would fully meet the purpose of and need for the project, which is to increase the availability of water sustainable over the 50-year period of analysis, in the greater Denver Metro area so that larger proportion of existing and future water needs can be met." R. at 036567.[3]

Because Alternative 3 raises the maximum water level of the reservoir by twelve feet, areas along the previous shoreline will be submerged. R. at 036567. Trees and large plants in the newly flooded areas would be removed before the water level is increased because they would pose a hazard to boats if they were left behind. R. at 036374, 036429. Additionally, recreation facilities set to be submerged would be removed and rebuilt at higher elevations. R. at 036568. This relocation of recreational facilities would require some dredging and result in a discharge of fill material into the reservoir. R. at 036569. The increase in water levels is expected to "primarily result in greater and more frequent reservoir pool fluctuations at Chatfield Reservoir," i.e., that

---

[3] *See also* R. at 036153:

The primary objective of the reallocation is to help enable water providers to supply water to local constituents, mainly for municipal, industrial, and agricultural needs, in response to rapidly increasing demand. Chatfield Reservoir is well placed to help meet this objective, because the reservoir provides relatively immediate opportunity to increase water supply storage without the development of significant amounts of new infrastructure, it lies directly on the South Platte River (efficient capture of runoff), and it provides an opportunity to gain additional use of an existing federal resource.

the elevation of the reservoir's surface will vary more widely than before. R. at 036105. This is expected to lead to a reduced recreational enjoyment of the park because the "unvegetated shoreline," as it is called in the FR/EIS, or "unappealing and unusable mudflats," as it referred to by petitioner, will be visible more often. R. at 036549; Docket No. 49 at 16.

Alternative 3 includes a compensatory mitigation plan that provides for environmental mitigation within the park and at off-site locations by, for example, protecting additional habitat and planting trees. R. at 036570, 036573-84. The Corps found that the impacts to environmental resources will be "fully compensated" by the proposed mitigation. R. at 036573. In a separate analysis, contained in Appendix W to the FR/EIS, the Corps determined that Alternative 3 complied with Section 404 of the CWA. R. at 038956-86. The Corps found that the "discharges and impacts to waters of the U.S. including wetlands of these reasonably foreseeable actions are minor and when combined with discharge of dredge and fill material for the relocation of recreation facilities and environmental mitigation would have minor cumulative effects on the aquatic ecosystem of Chatfield Reservoir and its watershed." R. at 038978

On May 24, 2014, the Corps issued a Record of Decision ("ROD") formally approving its selection of Alternative 3 as the plan for the project going forward. R. at 041875-76.

## II. STANDARD OF REVIEW

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Court must determine whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The scope of this review is narrow. *See Colo. Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009) (citation omitted). When reviewing an agency's factual determinations, the Court "ask[s] only whether the agency took a 'hard look' at information relevant to the decision." *Id.*

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). An agency's decision, therefore, is arbitrary if not supported by "substantial evidence." *Id.* "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'" *Id.* (citation omitted).

A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). The deference given to an

agency action "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

## III. DISCUSSION

### A.  Standing

Neither respondent nor intervenors challenge the standing of petitioner to bring this appeal.  However, even when standing is uncontested, the party seeking redress bears the burden of establishing standing.  *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To carry this burden, petitioner must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Id*. at 543 (internal quotation marks and alteration marks omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  As an organization with members, petitioner can establish standing either in its own right or on behalf of its members.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  The Court finds that petitioner has established standing at least with respect to member Ann Bonnell, who specifically identifies how her recreational and aesthetic interests would be harmed by the proposed alterations to Chatfield State Park.  Docket No. 49-4 at 5, ¶ 11; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." (citing *Morton*, 405 U.S. at 734-36)).

### B.  National Environmental Policy Act

#### *1.  Statutory Framework*

NEPA declares the federal government's policy to "use all practicable means and measures, including financial and technical assistance . . . to create and maintain conditions under which man and nature can exist in productive harmony."  42 U.S.C. § 4331(a).  To that end, NEPA imposes a requirement on federal entities to take a "hard look" at the environmental impact of a proposed action.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA was intended to ensure that agencies "consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns."  *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002).

Before an agency may take a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an in-depth environmental impact statement ("EIS").  42 U.S.C. § 4332(C); *see also Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006).[4]  Agencies must begin the NEPA evaluation process as early as possible so that the EIS serves to ensure incorporation of environmental values into the decisionmaking process, instead of rationalizing it after

---

[4] If a proposed federal action will not have a "significant" environmental impact, an agency may satisfy NEPA by preparing an environmental assessment, which is a "concise public document" that provides "sufficient evidence and analysis" for the agency to determine whether it needs to prepare an EIS or, instead, can issue a finding of no significant impact ("FONSI") for the action in question.  40 C.F.R. § 1508.9(a).  An environmental assessment need only include "brief discussions" of the need for the proposal, alternatives, and environmental impacts of both the proposed action and its alternatives.  40 C.F.R. § 1508.9(b).

the fact, and to avoid downstream delays.  40 C.F.R. §§ 1501.2, 1502.5.  An EIS is an

"action-forcing" device with two primary purposes: (1) to ensure that the decisionmaker

"will have available, and will carefully consider, detailed information concerning

significant environmental impacts," and (2) to make information available to the public,

which "may also play a role in both the decisionmaking process and the implementation

of that decision."  *Robertson*, 490 U.S. at 349.  An EIS must address the environmental

impact of the proposed action; adverse effects that cannot be avoided; mitigation

measures; alternatives to the proposed action, including a no-action alternative; direct,

indirect, and cumulative impacts of the proposed action; and any "irreversible and

irretrievable commitments of resources" entailed in implementing the proposed action.

42 U.S.C. § 4332; *see also* 40 C.F.R. § 1508.25; 40 C.F.R. § 1502.14 (the discussion

of alternatives "is the heart of the environmental impact statement" and it "should

present the environmental impacts of the proposal and the alternatives," including the

"alternative of no action," and the agency must identify its "preferred alternative").

Although NEPA imposes procedural requirements on federal agencies, NEPA

does not dictate the substantive results of an agency's analysis, and "[s]o long as the

record demonstrates that the agencies in question followed the NEPA procedures,

which require agencies to take a 'hard look' at the environmental consequences of the

proposed action, the court will not second-guess the wisdom of the ultimate decision."

*Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Robertson*, 490 U.S. at 350).

### 2. *Alleged NEPA Violations*

Petitioner alleges that the Corps violated NEPA by (1) using the term "average

year yield" as the measure of water that would become available due to the project; (2)

11

relying on water rights assumptions that were outdated when the FR/EIS was issued; and (3) failing to evaluate reasonable alternatives to the chosen project.  Docket No. 49 at 7.

### a.  "Average Year Yield"

Petitioner argues that the Corps' use of the term "average year yield" in the FR/EIS to discuss the project's goals "violated NEPA's requirement for informed public participation" because it is an "arbitrarily creation" that the Corps "made up."  Docket No. 49 at 48-49.  Instead, petitioner claims that the Corps should have used the "standard industry" term "safe yield" to describe how much water the project would reliably provide.  *Id*. at 48.  In petitioner's view, the use of novel terminology was deceptive to the public because use of the standard terminology "would have made plain that the project would reliably increase water storage in the region by 0 acre feet." *Id*. at 48-49 (emphasis removed).

The Corps' *Handbook on Water Supply Planning and Resource Management* ("Handbook") does not use the term "average year yield."[5]  R. at 00849.  The Handbook defines the term "yield" as the "quantity of water which can be taken, continuously, for

---

[5] Petitioner also argues that the Corps should have used the term "firm yield," which it likewise characterizes as standard.  Docket No. 49 at 48.  Petitioner, however, does not explain the meaning of "firm yield" or other terminology that it references, such as "dependable yield" or "dependable yield mitigation water."  *Id*. at 48-52.  "Firm yield" is used in the Handbook, but is not defined in the Handbook.  Petitioner does reference an internal Corps presentation stating: "Yield - also known as firm yield and dependable yield is the maximum sustainable flow at some point in time during the most adverse sequence of stream flow (critical period)."  R. at 010741.  Because this indicates the definition of "firm yield" and  "dependable yield" is the same as that of "yield," which is defined in the Handbook in a manner very similar to its definition in the presentation, the Court will confine its discussion to the terms "yield" and "safe yield."

any particular economic use.  For municipal and industrial water supply purposes, this is normally taken as the flow which can be guaranteed during the 50-year drought on 98% dependability."  R. at 00883.  The Handbook defines the term "safe yield" as the "maximum quantity of water which can be reliably available throughout the most severe drought of record, or some other specified criterion."  *Id*.  The term "average year yield" does not appear to be a term regularly used by the Corps, but is defined in the documents related to the project.

The term "average year yield" is defined in the Purpose and Need Statement of the FR/EIS Executive Summary as the "average amount of water per year that the water providers (not including Hock Hocking or Parker WSD) would have been able to store in Chatfleld during the 1942-2000 period of record [("POR")] if Chatfield Dam had existed during the entire POR."  R. at 036153.  The FR/EIS further explains how the value was calculated "for each water provider . . . based on inflows during each year of the POR, the effective date of each water provider's water rights, a maximum total storage for all water providers of 20,600 acre-feet, and whether water providers had effluents (non-natural flows) from water rights upstream that could be recaptured in Chatfield for later re-use."  *Id*.  The FR/EIS states that, because of "relatively low inflows in most years and the relatively low seniority of water rights held by the water providers, 20,600 acre-feet would have been able to be stored in Chatfield Reservoir in only 16 of the 59 years in the POR."  *Id*.

It is apparent that there is a discrepancy between the definition of the term "yield" in the Handbook and how the term is used in the FR/EIS within the term "average year yield."  Under the Handbook definition, "yield" refers to the amount of water that can be

taken for a particular use.  In the industrial and water supply context –  water from the

project is intended for such purposes, *see* R. at 036104 – yield is determined based on

availability in a 50-year drought.  "Safe yield" similarly refers to water available in a

record drought.  By contrast, the term "average year yield" refers to the amount of water

that would be available to be stored at Chatfield Reservoir in an average year, rather

than water that can be taken to be put to use during a drought.  But, the issue is not

whether these terms are used as one might expect without the definitions contained in

the FR/EIS, but rather whether the Corps' use of "average year yield" prevented

meaningful public participation.

Courts apply a "rule of reason standard (essentially an abuse of discretion

standard) in deciding whether claimed deficiencies in a [FR/EIS] are merely flyspecks,

or are significant enough to defeat the goals of informed decisionmaking and informed

public comment."  *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004) (citing

*Utahns for Better Transp.*, 305 F.3d at 1163).  In the context of the overall project

purpose, i.e. storage, and the definitions provided, there is little reason to believe that

the Corps' chosen terminology hindered public participation.  In particular, the

difference between storing the water for later use, as contemplated by the project, and

taking water for immediate use, as the term "yield" is used in the Handbook, is a

distinction that is readily understood.  Average year yield as defined provides an

understandable and relevant measure in context – it is the amount of water that could

be stored in an average year.  By contrast, petitioner's preferred "safe yield"

terminology would provide little information in the storage context.  Petitioner's

emphasis that the safe yield of the project is zero is simply a restatement of the truism

14

that there would not be water to store during a record drought. This fact is hardly surprising. The use of the challenged terminology does nothing to detract from the FR/EIS presenting "a reasonable, good faith, objective presentation of the topics [NEPA] requires" it to address in order to allow for public participation. *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (internal quotation marks omitted).

### b. Outdated Water Rights Assumptions

Petitioner argues that the Corps improperly relied on water rights assumptions that were outdated at the time the ROD issued. Docket No. 49 at 44. In particular, petitioner notes that the average year yield calculations in the FR/EIS, i.e., the amount of water that would be stored in the reservoir in an average year, were based on the water rights held by the fifteen initial participants in the project. *Id*. at 45 (citing R. at 036929). By the time the ROD was issued, several of the participant water providers were no longer involved in the project or were in the process of withdrawing. *Id*. (citing R. at 036150). The project includes a mechanism to reassign the storage capacity of such former participants through the CWCB, and petitioner does not argue that the storage capacity would go unclaimed. *Id*. at 46; *see also* R. at 036152 (discussing the "mechanism to transfer allocation ownership" and disclosing various changes in water providers). Rather, petitioner argues that it is possible that the new water providers who claim the storage capacity will have less-senior water rights than the former participants, leading to less water being stored in the reservoir. Docket No. 49 at 46-

47.[6]  Petitioner argues that such potential changes in the seniority of the participants'

water rights could have unknown environmental impacts and the FR/EIS "needs to be

remanded to the Corps to fully analyze the range of future impacts."  *Id*. at 45.

Respondent argues that it disclosed that participants were withdrawing from the

project and the under the "rule of reason" it was "entitled to rely on the best information

available at the time it makes a decision and [was] not required to speculate or

hypothesize about possible project participants or . . . seniority rights of every possible

unknown party or any potentially resulting environmental impacts."  Docket No. 54 at

51.  The Corps notes that the FR/EIS states that changes in the water providers could

alter the environmental impacts of any of the project proposals, and it discusses how

management of reservoir operations could impact the water level.  *Id*. at 52-53 (citing R.

at 036369; R. at 036371; R. at 036376).  The Corps claims that fluctuating water levels

were an environmental risk common to all alternatives and, therefore, the issue would

have made no difference in the selection of the preferred alternative.  *Id*. at 53 n.23.

The Tenth Circuit has clarified that an agency needs to do more that merely

"disclose the presence of uncertainty as to environmental consequences in order to

comply with NEPA."  *Lee*, 354 F.3d at 1241 n.7.  Rather, even if there is "incomplete or

unavailable information," an agency must evaluate "information relevant to reasonably

foreseeable significant adverse impacts" unless such information "cannot be obtained

_____

[6] As explained in the FR/EIS, water rights are based on a "prior appropriation"
seniority system whereby more senior rights holders have first claim on available water
over more junior participants.  R. at 036257.  The FR/EIS explains that the "water rights
of the sponsoring water providers are relatively junior in seniority, and the sponsors
would be able to store water only when their water rights were 'in priority,' or during 'run
of the river' high river flows."  R. at 036176.

because the overall costs of obtaining it are exorbitant or the means to obtain it are not known." 40 C.F.R. § 1502.22(b). In such cases, the agency must include in the EIS:

> (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

40 C.F.R. § 1502.22(b)(1). "Again, however, these steps are only required in regard to 'reasonably foreseeable significant adverse impacts.'" *Lee*, 354 F.3d at 1241 (quoting 40 C.F.R. § 1502.22(b)).

The record reflects that the Corps expected that no reasonably foreseeable significant adverse environmental impacts would result specifically from changes to the water rights held by the water suppliers. Rather, the Corps' analysis shows that it did not believe that potential changes in the water suppliers' rights would have a significant impact on pool elevation, or any corresponding environmental impact, in light of the other factors involved in determining flows and the planned active management of the pool elevation. *See, e.g.*, R. at 036376, 036406. The FR/EIS contains the results of the Corps' attempts to model future flows based on historical data from the POR, but acknowledges the limits of that data in predicting the future. *See* R. at 036391. The FR/EIS acknowledges that the chosen alternative would have the greatest expected "magnitude of pool elevation fluctuations," with fluctuations of "up to 21 feet (from the historical low elevation of 5,423 feet msl to the maximum elevation under Alternative 3 of 5,444 feet msl)." R. at 036406. The maximum pool elevation, i.e., a reservoir filled

to the non-flood limit, is acknowledged to be the exception rather than the rule because, based on historical data, it would be achieved on only 18% of days.[7]  *Id*.; *see also* R. at 36235, 36435 (reporting various expected pool elevations during the growing season based on historical data).  The FR/EIS extensively discusses the potential impacts of such pool fluctuations on the environment.  *See, e.g.*, R. at 036407, 036418-20, 036435-40.  The report also discusses how many different factors, beyond the water and storage rights held by the water providers, alter inflow and outflow from the reservoir and, therefore, pool elevation.  Additional factors expected to alter the flows include climate change,[8] changes in demand for water,[9] evaporation,[10] availability of

---

[7] Increased pool elevation is, in relation to flood control, a double-edged sword – the increased volume of stored water at higher pool elevations decreases the ability of the reservoir to be used to hold excess water during a flood and thereby prevent downstream flooding.  *See* R. at 036135.  The Corps concluded, however, that the risk of such increased flooding was minimal at the levels proposed.  *See* R. at 036176.  Even with the reallocation, the maximum pool elevation of 5,444 ft. msl remains well below the spillway crest elevation of 5,500 ft. msl with a remaining flood control pool capacity of approximately 186,179 acre-feet capacity.  *See* R. at 039074.

[8] *See, e.g.*, R. at 036164 ("More mid-winter precipitation throughout the state is predicted, and in some areas, a decrease in late spring and summer precipitation.  Regardless of precipitation, the timing of spring runoff is projected to shift earlier in the spring, and late-summer flows may be reduced. . . . Furthermore, there is potential for increased drought severity in the region due to higher temperatures alone."); R. at 036391 ("Although the historical data represent wide range of possible future flow conditions, it is possible that future flows may include periods of wet or dry conditions that are outside the range observed in the historical record, particularly as a result of climate change and increased hydrologic variability.").

[9] *See, e.g.*, R. at 036165 ("Drought conditions, especially since 2002, have caused concern among residents and political leaders.  Calls on senior water rights that had previously never been called out occurred in 2002, and reservoir surface elevations reached unprecedented low levels, bringing about mandatory water use restrictions.").

[10] Among other factors, evaporation varies with temperature and the reservoir's surface area.  R. at 36397.  The Corps' projections do not account for other factors

return flows, drier periods (drought),[11] wetter periods (including flooding), groundwater levels,[12] and construction of additional upstream reservoirs.[13]

The reservoir acts as a waystation in the broader hydrological system. The reservoir's inflows principally depend on environmental factors and its outflows depend on water demands by downstream, senior water rights holders. R. at 036388 ("Under any of the alternatives, when flows enter the reservoir, the first commitment would be to meet senior water rights needs. Once those needs were met, any excess flow would he retained in the available storage of the reservoir."). But the plan includes a framework for water supply management to determine when and how to store additional water at the reservoir, referred to as adaptive management. R. at 036416; *see also* R. at 036388. Adaptive management takes into consideration pool elevation and anticipated inflow as well as environmental factors such as water quality and maintaining minimum flows downstream. R. at 036416-17, 036426-27; *see also* R. at 037522-63. Additionally, it uses streamflow regulation in upstream reservoirs to make better use of high-flow periods.[14] The process is meant to be iterative, with study and

---

affecting evaporation. R. at 36392.

[11] *See, e.g.*, R. at 036264 ("Drought is a regular feature in Colorado.").

[12] *See, e.g.*, R. at 036266 ("Water discharged to alluvial aquifers can contribute to the flow in the aquifers or streams adjacent to them or can be lost to evapotranspiration.").

[13] *See, e.g.*, R. at 036391.

[14] *See, e.g.*, R. at 036265 ("Mean flow for the entire period of record is 231 cfs. Flows provided by streamflow regulation via Antero and Spinney Reservoirs are sustained throughout the year. These base flows allow Chatfield Reservoir operators to minimize potential impacts to the reservoir caused by rapid spring runoff or large storm

analysis used to alter future management decisions.  R. at 037527.

In sum, the FR/EIS shows that the water rights held by the water providers are only one factor among many that affect the pool elevation, discusses a plan for adaptive reservoir management to compensate for the various factors affecting pool elevation, and discusses the environmental impact of the fluctuations in pool elevation. Petitioner does not dispute any of this background, but nonetheless argues that the FR/EIS should have included a specific analysis of the potential environmental impact of changes in water rights' seniority.  Docket No. 49 at 45.  The Court disagrees.

It is unclear what, if any, benefit to public participation would have resulted or could result from further such analysis by the Corps.  The FR/EIS explains that water rights will impact pool elevation and that there are various expected environmental impacts depending on the amount of such fluctuation.  But pool elevation is based on multiple factors and it is not apparent that one of those factors can, or should, be looked at in isolation.  Moreover, there is substantial evidence in the FR/EIS that potential changes in water rights in isolation will have minimal impact.  In particular, the FR/EIS discloses that the "water rights of the sponsoring water providers are relatively junior in seniority," meaning that there is little likelihood that potential water providers will have materially more junior rights.  R. at 036130; *see also* R. at 36208 ("The water rights of the 12 water providers that would allow them to store water in Chatfield Reservoir are, in general, very junior in their relative priority and therefore they are expected to be in priority relatively infrequently.").  The FR/EIS also provides

_____

events.")

information on the limited impact that the withdrawal of particular water providers had on the water rights to be stored and the relevant flows impacting pool elevation. *See, e.g.*, R. at 036152 (discussing acquisition of storage rights of water providers by new participants). The FR/EIS discloses that:

> Following the review of the draft FR/EIS, the city of Brighton, a downstream user, withdrew from the project. Brighton had an allocated storage amount of 1,425 acre-feet. Its shares were picked up by upstream users in the following amounts: Centennial (1,181 acre-feet), Castle Pines Metro (125 acre-feet), and Castle Pines North (119 acre-feet). Brighton's withdrawal from the project will change the with-project flows presented in the FR/EIS slightly but *would be a small change to an insignificant impact*. It should he noted that 1425 acre-feet of storage would yield less than 500 acre-feet per year or less than one cfs spread over the year. *This amount of change would not have a measurable impact on streamflow along the South Platte River.*

R. at 036406 (emphasis added). Thus, the FR/EIS does not focus in particular on the potential environmental impact of potential changes in water rights, but it contains substantial evidence that any changes will have a limited impact and also discloses the Corps' plans for adaptive management of the reservoir based on the relevant factors. By providing an extensive discussion of the potential environmental impact of fluctuations in pool elevation, the Corps has shown that it took the requisite "hard look" at the environmental impacts of its chosen alternative and provided the public with the information necessary to understand and participate in the selection process. Accordingly, the Court finds that the FR/EIS's lack of a specific discussion of the environmental impact of potential water rights changes is not "significant enough to defeat the goals of informed decisionmaking and informed public comment." *Lee*, 354 F.3d at 1237 (10th Cir. 2004) (citing *Utahns for Better Transp.*, 305 F.3d at 1163).

### c. Consideration of Alternatives

The Corps was required to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). As part of this analysis, the Corps, in addition to any other reasonable alternatives, needed to "identify and analyze its preferred alternative, as well as a null or 'no action' alternative that would occur if the agency elected to maintain the current state of affairs unchanged." *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012) (citing 40 C.F.R. § 1502.14). When assessing an agency consideration of alternatives, the Court must apply a "rule of reason." *New Mexico ex rel. Richardson*, 565 F.3d at 709.

> The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*Id.* (citations omitted).

Petitioner argues that the Corps failed to consider certain reasonable alternatives to the preferred alternative. Specifically, petitioner argues that the Corps should have considered "enhanced water conservation, upstream gravel pits for water storage, and the already-existing Rueter-Hess Reservoir for water storage." Docket No. 49 at 36. Petitioner argues that the Corps' basis for rejecting these possibilities was impermissible under the NEPA and should be rejected. *Id*.

### i. Enhanced Water Conservation

Petitioner claims that the Corps improperly rejected water conservation as an incomplete alternative. Docket No. 49 at 37. In particular, petitioner faults the Corps for failing to "actually analyze how much water supplies could be increased through more aggressive conservation." *Id*. at 38.

The Corps responds that it devoted significant analysis to water conservation and did not reject conservation as merely incomplete. Rather, the Corps argues that the goal of the project is increasing supply, a goal that cannot be accomplished through conservation. Docket No. 54 at 47.[15]

The record shows that the Corps addressed water conservation during the administrative process, but did not consider it as part of the Alternatives. *See* R. at 036844-61. In addition to several pages in the main text of the FR/EIS, one appendix of the FR/EIS is dedicated to discussing the actions water providers plan to take to increase water conservation regardless of the project. R. at 036166 ("Some examples of conservation efforts that have been used in the Denver Metro area include education, rebates for low-flush toilets and high efficiency washing machines, water use audits, landscape and irrigation system audits, and tiered water rate structures."); R. at 036844-61 (Appendix AA, *Summaries of Water Provider's [sic] Water Conservation Programs*); *see also* R. at 036187 ("All 12 water providers recognize the importance of incorporating aggressive and meaningful water conservation efforts in their

---

[15] Similarly, the intervenors argue that the Corps correctly treated water conservation as an "'independent parallel action'" that would be undertaken by the water providers along with any of the project alternatives. Docket No. 56 at 9 (quoting R. at 036203).

operations."). Water conservation is discussed as a means of reducing future increases in demand for water, but, in contrast to increased storage, it is not seen as a means to increase the amount of available water. R. at 036187 ("Each of these entities is part of the reallocation project because they need additional water, which is ever increasingly costly and difficult to acquire."). Ultimately, the FR/EIS concludes that further conservation measures would not "result in the elimination or lessening of the dependence on the groundwater supplies," R. at 036187, or be "adequate to make up for the shortfall in water needed by the water providers to meet current and future water needs over the next 50-year period." R. at 036193; *see also* R. at 036167. Essentially, the FR/EIS acknowledges the importance of the water providers' conservation plans, discusses the role of water conservation, and concludes that conservation does not meet the project's goal of increasing water storage and availability.

With this background, it is apparent that petitioner's argument that the Corps improperly failed to discuss how water conservation could increase water supply is a non-sequitur. As stated in the FR/EIS, "[c]onservation helps to stretch existing resources, but does not solidify additional needed water supplies." R. at 036187. Thus, conservation may allow the water providers to slow the increasing demand for water, but there is no indication that water conservation could help accomplish the project's main goal, i.e., increasing greater Denver's water supply. The FR/EIS clearly contemplates the role of increased conservation efforts in overall water planning, but does not consider water conservation as a component of any specific Alternative. The Court finds this approach reasonable. *See City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) ("[A]n alternative is properly excluded from consideration in

an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)).[16] Including enhanced water conservation as part of an Alternative, as petitioner proposes, would not have altered the Corps' task under NEPA – to determine which Alternative would best meet the project's goals, i.e., increasing storage capacity and water availability – while disclosing and evaluating environmental impacts of the Alternatives. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1032 (10th Cir. 2002). The Court will not second-guess the Corps' well-supported determination not to include water conservation as a means to achieve the project's goals as part of an Alternative, instead of as a separate consideration. *See Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (upholding an agency's decision to dismiss from consideration certain opportunities that did not advance the objectives of the project).

### ii. Upstream Gravel Pits

Petitioner argues that the Corps improperly failed to consider using upstream

---

[16] Petitioner does not ask the Court to review whether the goals of the project themselves were reasonable, *see* Docket No. 49 at 38; therefore, the separate question of whether enhanced water conservation could have alleviated the need for increased storage is not before the Court. *Cf. City of Alexandria*, 198 F.3d at 867 ("We engage in both of these inquiries—whether an agency's objectives are reasonable, and whether a particular alternative is reasonable in light of these objectives—with considerable deference to the agency's expertise and policy-making role.") (citation omitted); *see also* R. at 036167 ("Estimated demand met by identified projects and processes, as well as additional water conservation, totals 319,100 acre-feet per year (about 78 percent of future needs), leaving a 90,600 acre-foot gap (or 22 percent) in the South Platte River Basin.").

gravel pits for water storage when it did consider using downstream gravel pits as part of certain Alternatives. Docket No. 49 at 39, 43. Petitioner focuses in particular on the upstream Titan ARS gravel pit, which was found to be able to store 4,500 acre-feet of water.[17] *Id*. at 39.

The Corps argues that its explanation in the FR/EIS that "[r]eallocation of storage less than 7,700 acre-feet was considered by the water providers to provide too little water supply benefits for the costs involved" is sufficient. R. at 036176; *see also* Docket No. 54 at 48. The FR/EIS also states that the use of upstream gravel pits was eliminated due to the "logistical difficulties of combining reservoirs to meet the storage requirements of the project." R. at 036197.

The FR/EIS lists the numerous possibilities the Corps considered during its preliminary review as well as the criteria used to determine the alternatives that would be given detailed consideration. R. at 036179-85. Among the criteria used were "[l]ogistics and technology," including "[d]esign and construction feasibility" and "[o]perational feasibility." R. at 036179-80. The Corps is not required to consider an unlimited number of alternatives and has broad discretion in defining the goals of the project. *See Colorado Envtl. Coal.*, 875 F. Supp. 2d at 1245 ("[T]he phrase 'all other reasonable alternatives' is not entirely open-ended. To define the boundaries of the range of alternatives that must be considered, the agency must first define the objectives of the proposed action, a task in which the agency enjoys considerable

---

[17] Petitioner claims there is record evidence that the Titan ARS pit could potentially store up to 11,000 acre-feet of water, Docket No. 49 at 39, but the only evidence cited is a letter offering to provide a separate report allegedly indicating that the pit could store that amount "when expanded." R. at 039473.

discretion.") (citation omitted).  An agency "may also reject alternatives that are not

'significantly distinguishable from the alternatives already considered' or under

consideration."  *Id*. (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 708-09).  Here,

petitioner faults the Corps for not analyzing an alternative using upstream pit storage,

but does not explain how such an alternative would differ materially from Alternative 2,

which included downstream pit storage.  Nor does petitioner argue that the logistical

difficulties of combining multiple storage options and a minimum of 7,700 acre-feet of

added storage referred to in the FR/EIS are not a reasonable, good-faith criteria for

determining whether a possibility is practical or effective in achieving the project's goals.

*See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011) ("NEPA

does not require agencies to analyze the environmental consequences of alternatives it

has in good faith rejected as too remote, speculative, or . . . impractical or ineffective."

(quoting *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030)).  The Corps was

only required to "'briefly discuss'" the reasons that possible options were eliminated

from detailed study as plan alternatives.  *Utahns for Better Transp.*, 305 F.3d at 1166

(quoting 40 C.F.R. § 1502.14(a)).  The Court finds that it did so.  The FR/EIS satisfied

NEPA by explaining that the upstream pits did not meet the project's storage

requirements and referring to the logistical difficulties of combining storage options.

*See All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1445 (10th Cir. 1992)

(holding that a reviewing court's "job is not to 'second-guess the experts' in policy

matters but rather it is to determine 'whether the statement is a good faith, objective,

and reasonable presentation of the subject areas mandated by NEPA.'" (quoting

*Manygoats v. Kleppe*, 558 F.2d 556, 560 (10th Cir. 1977)).

### iii. Rueter-Hess Reservoir

Petitioner argues that the Corps improperly failed to give detailed consideration to using the Rueter-Hess Reservoir as an alternative to the chosen project. Docket No. 49 at 40-43. Petitioner claims that the rationales provided in the FR/EIS and in response to public comments are too conclusory and not supported by the record. *Id*. at 42. In particular, petitioner argues the Corps could not reject using the Rueter-Hess Reservoir based on needing action by a third party because the project is an integral part of addressing a broader water problem. *Id*. at 41 (citing *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 835 (D.C. Cir. 1972)).

The Corps responds that its explanation was sufficient and that it reasonably limited the alternatives considered in detail to those within its jurisdiction that could address the "discrete, regional problem" that the project targeted. Docket No. 54 at 49.

Rueter-Hess Reservoir is located approximately 9.5 miles south of Chatfield Reservoir and is owned and operated by the Parker Water and Sanitation District ("PWSD"), one of the project's original participants. R. at 036184. It was expanded from 2008-2012. R. at 036516. The Rueter-Hess Reservoir is not located along the South Platte River and its water allocation is subscribed and permitted by a separate authority. R. at 036198. The FR/EIS explained that:

> The reservoir . . . is anticipated to primarily meet the needs of PWSD in serving its customers. Since completion of the expansion in 2012, PWSD has not made any additional capacity available for sale. . . . Therefore, [it was] eliminated from further consideration.

*Id*. The Court finds this discussion is sufficient to satisfy the Corps' obligation to "briefly

discuss" why the option was eliminated from detailed consideration in the FR/EIS. 40 C.F.R. § 1502.14(a).[18]

Further, the situation here contrasts with the situation at issue in *Morton,* 458 F.2d 827, where the court held that the EIS should have evaluated a broad range of alternatives outside the agency's authority. In *Morton*, the court faulted the EIS for only discussing alternatives that were within a single agency's authority where multiple agencies were tasked by the President with responding to a national crisis. *Id*. at 835. Here, by statute, the Corps was given responsibility (in coordination with CDNR) for evaluating changes to the allocation of water storage in the Chatfield Reservoir. *See* WRDA, § 808. Accordingly, because what constitutes a "reasonable alternative" is determined with reference to the project's objectives, the NEPA did not require the Corps to discuss a broad range of alternatives beyond those within the Corps' authority. *See City of Alexandria*, 198 F.3d at 869 (holding that *Morton*'s broad scope of reasonable alternatives would "make little sense for a discrete project within the jurisdiction of one federal agency"). Moreover, the Rueter-Hess Reservoir expansion had already been completed when the FR/EIS and ROD were issued, and there is no suggestion it could be further expanded to increase future water availability. *See* R. at 036516. Petitioner argues, in effect, that, after the expansion of the Rueter-Hess Reservoir, the project's participants should have simply bought storage capacity in the

_____

[18] Petitioner also argues the Corps' response to public comments that, for many project participants, using the Rueter-Hess Reservoir would require additional infrastructure was "factually incorrect," but goes on to state that the Corps was still "working on permitting" some related infrastructure as part of another project. Docket No. 49 at 40 n.6; *see also* R. at 037197. Petitioner does not point to any record evidence that undercuts the Corps' stated rationales.

Rueter-Hess Reservoir, rather than increasing storage elsewhere. *See* Docket No. 49 at 42. Had the participants done so, it would have done nothing to accomplish the project's goal of increasing water availability, but instead would have simply transferred pre-existing storage capacity to different water providers. R. at 036167 (discussing how existing projects and anticipated conservation will not satisfy expected future demand). Accordingly, the Court finds that petitioner has not shown that the Corps violated the NEPA.

### C. Clean Water Act

#### 1. Statutory Framework

The CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Dredged and fill materials are defined as pollutants under the CWA. 33 U.S.C. § 1362(6). In certain circumstances, however, Section 404 of the CWA authorizes the Corps to issue permits "for the discharge of dredged or fill material into the navigable waters." 33 U.S.C. § 1344. The waters of the United States at issue in this case are the reservoir and the wetlands in Chatfield State Park. R. at 038958. Where, as here, the discharge in question is caused by the Corps itself, the Corps must apply the same analysis it would before issuing a permit for a discharge to another entity. 33 C.F.R. § 336.1(a).

The Corps must not issue a permit for a discharge of dredged or fill material (or allow its own such discharge) "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."

40 C.F.R. § 230.10(a).  Such a favored alternative is referred to as the least environmentally damaging practicable alternative or "LEDPA."  "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).[19]  Where no less damaging, practicable alternative is available, the applicant must show that all "appropriate and practicable steps" will be taken to "minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. § 230.10(d).  The Corps is required to balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments."  33 C.F.R. § 320.4(a)(1).

The Section 404 Guidelines require the Corps to consider "both individual and cumulative impacts" of the proposed project, as well as practicable alternatives that would have less adverse impact on aquatic systems.  40 C.F.R. §§ 230.6, 230.10(a).  Where multiple sites in an "interrelated wetland area" are potentially affected, the impacts on the whole area will be evaluated together because "the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources."  33 C.F.R. § 320.4(b)(3).

---

[19] Although not at issue here, there is a presumption that practicable alternatives exist that do not involve special aquatic sites when the proposal is not water dependent. 40 C.F.R. § 230.10(a)(3); *see also Del. Riverkeeper Network v. Sec'y of Pa. Dep't Envtl. Prot.*, 870 F.3d 171, 180 (3d Cir. 2017) ("If a project is water dependent, like a dam, it is impossible to construct without impacting an aquatic site.").  Thus, when performing the Section 404 analysis, the Corps must first evaluate whether the project's purpose is water dependent.  *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1260 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010) (citations omitted) ("*Van Antwerp*").

## 2. Alleged CWA Violations

Petitioner argues that the Corps violated the CWA by failing to select the least environmentally damaging practicable alternative. Docket No. 49 at 22. First, petitioner argues that the Corps' CWA analysis was improper because it failed to use the same alternatives used for the NEPA analysis to determine the LEDPA. *Id*. at 24 (citing 40 C.F.R. § 230.10(a)). Had the Corps used the NEPA alternatives, petitioner claims that the selected project could not have been selected because "Alternative 3 is the most damaging alternative and therefore could not be chosen as the LEDPA." *Id*. at 25. Second, petitioner argues that, by considering only the recreational facility modifications when considering alternatives under the CWA, the Corps improperly segmented the project. *Id*. at 29. Under NEPA, it is improper for an agency to segment and separately analyze actions that are "connected" because such actions are "closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25. Petitioner argues that this so-called "anti-segmentation rule" should apply under the CWA as well. Docket No. 49 at 33. Specifically, petitioner claims that the relocation of the recreational facilities is connected to the project as a whole and, therefore, it was improper for the Corps not to consider the whole project when evaluating alternatives under the CWA. *Id*.[20] In both of its arguments, petitioner challenges the scope of the

---

[20] Petitioner also argues that communications within the Corps, and the Corps' discussions with the EPA, show that the Corps incorrectly applied the law. Docket No. 49 at 31-32; Docket No. 58 at 8-10. The Corps acknowledges that some agency employees and the EPA initially disagreed that the Section 404 analysis should be performed only in reference to the portion of the project that would lead to a discharge, but it ultimately agreed that the Corps' analysis was proper. Docket No. 54 at 32. But, as the Corps correctly points out, only the agency's ultimate decision is reviewed. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007); *Ctr. for Biological*

Corps' LEDPA analysis, not the substance of the analysis the Corps performed.  See Docket No. 58 at 4.

The Corps responds that it properly developed and evaluated alternatives based on the "overall project purpose for the activity requiring a discharge into waters of the United States."  Docket No. 54 at 25 (citing 40 C.F.R. § 230.10(a)).  Specifically, the Corps focused on the purpose of relocating the recreational facilities, which would lead to discharge, as "maintain[ing] the recreation experience following the reallocation of storage at Chatfield Reservoir."  R. at 038978-79.  The Corps argues that there is no requirement that it evaluate the same alternatives under the NEPA and the CWA. Docket No. 54 at 35.  The Corps also argues that the anti-segmentation rules applicable under NEPA have never been applied under the CWA and should not be here.  *Id*. at 39-42.

### a.  Use of NEPA Alternatives for CWA Section 404 Analysis

Petitioner relies, Docket No. 49 at 7, on the following portion of the implementing regulation for Section 404 of the CWA to argue that alternatives considered under NEPA provide the basis for evaluating alternatives to the LEDPA:

> For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, *will in most cases* provide the information for the evaluation of alternatives under these Guidelines.  On occasion, *these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph* or may not have considered the

*Diversity v. Fed. Highway Admin.*, 290 F. Supp. 2d 1175, 1194 (S.D. Cal. 2003) ("[A]n effective deliberative process, by its very nature, requires the expression of open, frank and often contradictory opinions.").  Accordingly, the Court confines its analysis to the propriety of the analysis contained in the FR/EIS.

alternatives in sufficient detail to respond to the requirements of these
Guidelines.  In the latter case, it may be necessary to supplement these
NEPA documents with this additional information.

40 C.F.R. § 230.10(a)(4) (emphasis added).  The regulation notes that the same

underlying information is often appropriate for both NEPA and CWA purposes.  The

regulation also states that the range of alternatives addressed under NEPA will, on

occasion, differ from those that must be addressed under the CWA.  *Id.* ("[T]hese

NEPA documents may address a broader range of alternatives than required to be

considered under" the LEDPA analysis.).  However, by its terms, 40 C.F.R.

§ 230.10(a)(4) does not require that NEPA alternatives be evaluated in determining

LEDPA.

Petitioner cites two cases to support the proposition that the Corps should have

evaluated the NEPA alternatives as part of its LEDPA analysis.  *Van Antwerp*, 709 F.

Supp. 2d 1254; *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152 (10th

Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).  Neither case supports

petitioner's proposition.  In *Van Antwerp*, the court determined both that the Corps

incorrectly determined that the limestone mining project was water dependent and that

the agency improperly failed to evaluate any alternatives based on a conclusory

statement that no practicable alternatives existed.  *Van Antwerp*, 709 F. Supp. 2d at

1268 ("By not applying the presumption that environmentally preferable and practicable

alternatives to this limestone mining were available, the permit applicants were excused

from 'clearly' demonstrating the absence of practicable alternatives.").  In *Utahns for

Better Transp.*, the court rejected the agency's LEDPA analysis for, among other things,

failing to explain why the identified alternatives were not practicable, not for failing to evaluate all NEPA alternatives. *Utahns for Better Transp.*, 305 F.3d at 1189-90. Neither case addresses whether the Corps must evaluate NEPA alternatives in its LEDPA analysis. Accordingly, the Court rejects petitioner's argument that the Corps was required to evaluate the NEPA alternatives under the CWA to determine if any was the LEDPA.

### b.   Applicability of Anti-Segmentation Under the CWA

Regulations implementing the NEPA "require that 'connected' or 'closely related' actions be discussed in the same impact statement." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv*., 297 F.3d 1012, 1028 (10th Cir. 2002) (quoting 40 C.F.R. § 1508.25(a)(1)). "One of the primary reasons for requiring an agency to evaluate 'connected actions' in a single EIS is to prevent agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact." *Id*. (citations omitted). The anti-segmentation rule prevents agencies from issuing multiple EAs finding no significant environmental impact for specific actions where the integrated project would have a significant environmental impact and require the issuance of a detailed EIS. Actions must be considered together if: "1) the action automatically triggers another action requiring an environmental impact statement; 2) the action 'cannot or will not proceed unless other actions are taken previously or simultaneously;' or 3) the action is an 'interdependent part[ ]' of a larger action and depends on that larger action for its justification." *Id*. at

1029 (quoting 40 C.F.R. § 1508.25(a)(1)(i)-(iii)) (alterations in original).

Petitioner asks the Court to apply the NEPA anti-segmentation rule to the Corps' CWA Section 404 analysis and hold that the Corps' analysis was not in accordance with law.  Petitioner acknowledges whether the anti-segmentation rule applies to the LEDPA analysis is an issue of first impression.  Docket No. 49 at 9.  The Court finds that the anti-segmentation rule does not apply here.

First, the policy underlying the anti-segmentation rule is not implicated.  The bulk of the discharge that requires Section 404 analysis results from the relocation of the recreational facilities and associated mitigation.  R. at 038983 ("Modifications to the recreation facilities comprise the vast majority of actions involving dredge and fill activities.").  The Corps' analysis, however, does not segment the various actions involved in relocating the recreational facilities or their associated discharges to minimize their impact, but instead considers all such actions and the resulting discharge as a whole.  R. at 038973-78; R. at 038978 ("Cumulative impacts of the proposed dredge and fill activities associated with the Recreation Facility Modification Plan are expected to be small.  These proposed activities, in total, would have little effect on the aquatic ecosystem due to limited dredge and fill footprints of the respective sites.").  Thus, the Section 404 analysis does not minimize the impact of the total discharge by artificially dividing it among connected actions.[21]  Indeed, despite separately discussing

[21] Likewise, contrary to petitioner's argument, Docket No. 49 at 28-29, the Corps does not rely on mitigation as a justification for determining that Alternative 3 is the LEDPA in alleged violation of the *Memorandum of Agreement between the EPA and the Department of the Army Concerning the Determination of Mitigation Under the CWA Section 404(b)(1) Guidelines* (Feb. 6, 1990), Docket No. 33-2.  Rather, the Corps considered mitigation as a *cause* of the discharge of dredge and fill materials, R. at

36

alternatives to the relocation of the recreation facilities and the environmental

mitigation, the Corps considered the cumulative impact of all discharges required by the

project as a whole in performing its LEDPA analysis.  R. at 038978 ("The discharges

. . . of dredge and fill material for the relocation of recreation facilities and environmental

mitigation would have minor cumulative effects on the aquatic ecosystem of Chatfield

Reservoir and its watershed.").  Such consideration of the cumulative impact of

connected actions is what the anti-segmentation rule is intended to require.[22]

Second, there is no legal basis for applying the NEPA anti-segmentation rule to

analysis under the CWA.  *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,*

*Inc.*, 462 U.S. 87, 92 (1983) (reaffirming the holding of *Vermont Yankee Nuclear Power*

*Corp. v. NRDC*, 435 U.S. 519 (1978), that "courts generally lack the authority to impose

'hybrid' procedures greater than those contemplated by the governing statutes.").  The

regulations implementing Section 404 require the Corps to consider "if there is a

practicable alternative to the proposed discharge which would have less adverse impact

on the aquatic ecosystem, so long as the alternative does not have other significant

_____

038961, and evaluated whether there were LEDPA to the proposed mitigation that
would not require a discharge.  R. at 038981-82.  The Corps concluded that, "[w]hile
these approaches are a feasible alternative to avoid the discharge of dredge or fill
material into waters of the U.S., including wetlands, it would result in greater area of net
disturbance and environmental impact; and would complicate the construction,
maintenance, and reliability of the mitigation."  R. at 038982.  Petitioner does not
challenge this conclusion.

[22] For the same reason, the concern that an applicant or the Corps would "'define
a project [narrowly] in order to preclude the existence of any alternative sites and thus
make what is practicable appear impracticable'" is not implicated here.  *Nat'l Wildlife*
*Fed'n v. Whistler*, 27 F.3d 1341, 1346 (8th Cir. 1994) (quoting *Sylvester v. United*
*States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989)).

adverse environmental consequences." 40 C.F.R. § 230.10(a). In applying this regulation, the Corps interpreted it to require consideration of alternatives to the proposed discharge, not alternatives to related actions that will not result in discharge. *See* R. at 038978-81. "[S]ubstantial deference is given to an agency's interpretation and application of governing statutes, and particularly its own regulations. *Whistler*, 27 F.3d at 1344 (internal citations omitted).[23] Although petitioner may read the regulation differently, "this court cannot ignore the Corps' interpretation of the Clean Water Act and its accompanying regulations." *Id.* at 1345-46 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), and *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980)). The Corps' application is based on a rational reading of the regulation and, therefore, the Court will not disturb it. *Ford Motor Credit Co.*, 444 U.S. at 568 ("[J]udges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational."). Further, nothing about the regulatory scheme compels a contrary conclusion. There is no provision in the CWA implementing regulations that parallels the anti-segmentation rule under the NEPA requiring that "connected" or "closely related" actions, 40 C.F.R. § 1508.25(a)(1), be discussed together with those actions

_____

[23] The Court finds that the Corps' interpretative choice, as reflected in the FR/EIS, is entitled to deference because the FR/EIS was subjected to a formal, public comment process and the Corps' reasoning is persuasive. *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). The record reflects that the agency gave thorough consideration to its interpretation. R. at 038701, 038695, 044692, 044652; *see also Mead Corp.*, 533 U.S. at 228 ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (alterations in original))).

that cause the proposed discharge.  Accordingly, the Court finds that petitioner has not

shown that the Corps' focus on alternatives to the recreational facilities' relocation in its

LEDPA analysis, instead of alternatives to the project as a whole, is contrary to law.

Because petitioner has not shown that the Corps acted arbitrarily, capriciously,

or contrary to law in selecting Alternative 3 as the plan for the reallocation project under

either the NEPA or the CWA, the Court will affirm the Corps' decision.

## IV.  CONCLUSION

For the above-stated reasons, it is

**ORDERED** that the agency decision is **AFFIRMED**, judgment shall enter in favor

of respondent, and this case shall be closed in its entirety.


DATED December 12, 2017.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge